

# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## Criminal Investigation

# Memorandum of Interview

| Investigation #: | | Location: | IRS-CI Conference Room 2004 |
|---|---|---|---|
| Investigation Name: | | | Van Nuys CA 91401 |
| Date: | March 29, 2011 | | |
| Time: | ~5:35 p.m. ~7:42 p.m. | | |
| Participant(s): | Kendrick Green, Borrower | | |
| | Darline M Toussaint, IRS Special Agent | | |
| | Morgan Bailey, FBI Special Agent | | |
| | | | |

On the above date and time, Special Agents Toussaint and Bailey interviewed Kendrick Green regarding seven properties that he purchased during 2006 and 2007. The agents identified themselves and explained to Green that they are assisting the United States Attorney's Office in San Diego, CA with a Grand Jury Investigation relating to mortgage fraud. The following is a summary of the interview:[1]

1. The Special Agents showed Green four Uniform Residential Loan Applications signed by Green for the properties located at 3532 Meade Ave., #7, San Diego, CA 92116; 3532 Meade Ave. #32, San Diego, CA 92116; 3532 Meade Ave., #41, San Diego, CA 92116; and 6824 Rolando Knolls Dr. San Diego, CA 91941. Green indentified his signatures on the above loan applications, and informed the agents that the loan applications appear to be the loan applications that he signed in 2006 and 2007 when he purchased the above properties.

2. The Special Agents also showed Green an un-signed Residential Loan Application for the property located at 635 San Miguel Ave., Spring Valley, CA 91977. Green informed the agents that he purchased 635 San Miguel that the loan application appears to be the same loan application that that he signed when he purchased the above property.

3. Green informed the agents that he also purchased the properties located at 3532 Meade Ave., #40, San Diego, CA 92116 and 3532 Meade Ave., #31, San

---

[1] Sometime around 6:45 p.m., there was an approximate 10 minute break in the interview when Green informed the agents that he needed to check on his vehicle which was at a parking meter. The Federal Building was closed to the public during this time, because it was after business hours, so the agents escorted Green outside to add money to the parking meter. Special Agent Bailey paid $1 on the parking meter for Green.

BYW-RPRTS-000074

Diego, CA.[2]

4.  Green informed the agents that during 2006 and 2007, he was an Account Executive at a company called WMC.  Green stated that at one time WMC was known as Weyerhaeuser Mortgage Company, and then was taken over by General Electric.  WMC was a wholesale originator of subprime residential mortgages.  Green informed the agents that WMC is no longer in business.

5.  Green's job at WMC as an Account Executive was to find clients for WMC. Green was in charge of the San Diego area and as part of his job duties he visited various real estate offices in the San Diego area and performed sales pitches for the real estate offices to submit loan applications to WMC.

6.  Sometime in 2006,




    company was looking for a real estate broker to work with.   Green introduced a real estate broker named Dorita, a.k.a. Jocelyn (Green later remembered this individual as Dorita Edwards, a.k.a. Jocelyn Edwards).

7.


8.                                            there was an apartment complex in the San Diego area where a developer was turning the apartments into condominiums, and that Green could make a lot of money if he became one of the buyers.

9.



10. Green agreed to purchase the properties, because he felt like he would be able to keep up with the mortgage payments with renters in each property.

11.


12. Green received telephone calls from various individuals whom he cannot remember names of, with questions relating to his loan applications for the

---

[2] The agents did not have residential loan applications to show Green for the properties located at 3532 Meade Ave. #31 and 3532 Meade Ave. #40.

BYW-RPRTS-000075

property purchases; however other than                    , Green does
not remember meeting any other employees.

13.
                          Green stated that he agreed to make the purchases
   and that he drove down to San Diego and signed the loan documents, but that
   he "wasn't thinking."

14. The conditions of the properties were livable, but Green performed minor
    upgrades to the properties, such as paint, and new carpet to make the
    properties move in ready for the renters.

15. After Green purchased the properties, he had some renters, but the monthly
    rental payments were not enough for him to cover the mortgage payments.
    Three of the properties already had renters, and Green had to find renters for
    the additional properties.

16. Green initially stated that he planned on using the San Miguel Ave., property as
    his primary residence; however Green later stated that Rolando Knolls Drive
    was the property that he planned on using as his primary residence.  At the
    end, Green did not use either property as his primary residence.

17.                    informed Green that the company she works for would pay for
    three months of the mortgage payments for each property purchased by Green.
    Green informed the agents that he did not receive the three months mortgage
    payments directly, because the company paid three months of mortgage
    payments for each property Green purchased directly to the lender.

18. At times, Green called                    company to complain about not being able
    to handle all the expenses that came with having all of the properties.  A few
    times, the company gave him $400 to assist him with paint and carpet on the
    properties.

19. Green did not receive any other compensation or money for the purchase of the
    properties.

20. Green informed the agents that paying the mortgage for three months was
    something that "they" did for other buyers, and that this was their way getting
    buyers interested.

21

22. Green did not have any construction work done on any of the properties that he
    purchased as part of escrow.

23. After Green purchased the properties, his life fell apart when he realized that he
    could not keep up with the mortgage payments.  Sometime in 2009, Green had
    to file for bankruptcy and he was lucky that he got to keep the house where he

BYW-RPRTS-000076

currently lives.

24. Green thinks that he got taken advantage of, and that he was a victim of predatory lending. Green believes that GONZALEZ and her office took advantage of him.

25. The agents showed Green the uniform residential loan applications and HUD1 closing statements for each property that he purchased. Green stated the following after reviewing the HUD1 closing statements and residential loan application for each property[3]:

26. Rolando Knolls Drive:
    a. The residential loan application for 6824 Rolando Knolls Drive, La Mesa CA, signed by Green on 3/31/2006, states that the property will be primary residence. Green informed the agents that this was placed on the loan application because he planned to move into the property and make the property his primary residence.
    b. The residential loan application states that Green was employed with WMC, and that he was making $13,000 per month in income. Green informed the agents that an income of $13,000 per month for him at that time was accurate. Green informed the agents that during that period in 2006, he made an average of $10,000 to 12,000 per month working at WMC.
    c. GONZALEZ' office asked Green questions over the telephone to assist in preparing the loan application. Individuals at          office asked Green how much money he made, and where he worked, and Green told them. They also obtained Green's credit report. Green stated that a lot of the information needed to complete the loan applications were on Green's credit report.
    d. Green signed the loan documents at the escrow office. Green does not remember where the escrow office was located or who he met with.
    e. Green focused on the good faith estimate during the process of signing documents for the property purchases. Green reviewed the good faith estimate to make sure that there were no extra points added.
    f. Green does not know who Don Shore is. Green never met with Don Shore. Green does not remember ever speaking to Don Shore.
    g. After seeing the name "Accurate Lenders" on his loan application, Green thinks that this may have been the name of the office where          worked.
    h. Green does not know why there is a pay-out of $69,000 to BYW Construction LLC on the HUD1 settlement statement dated 4/7/2006. Green has never heard of BYW Construction LLC. Green does not know anything about BYW Construction.
    i. Green was shown a contractors invoice from BYW Construction dated 3/9/2006. Green has never seen this invoice. Green never hired BYW to perform any work on any of the properties that he purchased. Green

---

[3] The documents shown to Green during the interview has been attached to this memorandum.

BYW-RPRTS-000077

does not recognize the signature on the invoice.

27. San Miguel Ave.
   a. The unsigned residential loan application for 635 San Miguel Ave., Spring Valley CA states that Green makes $15,300 per month. Green previously informed the agents that his actual income averaged between $10,000 and 12,000 per month.
   b. Green does not know why the loan application states that the property will be his primary residence. Green purchased San Miguel Ave. as an investment, and the property was rented out after the purchase.
   c. Green does not know why there is a pay-out to BYW Construction for $93,000 on the HUD1 Settlement Statement dated 6/2/2006. Green does not know who or what BYW is.
   d. Green was shown an invoice dated April, 2006 from BYW Inc. Green has never seen the invoice, and he did not hire BYW to perform any work to any of the properties that he purchased.

28. Meade Ave., #7
   a. The residential loan application for 3532 Meade Ave., #7, San Diego CA signed by Green on 2/10/2007 states that the property will be an investment property. This is accurate because Green rented out the property, and purchased it as an investment property.
   b. Green remembers hearing the name Don Shore in GONZALEZ' office, but Green never met or saw Don Shore.
   c. Green does not know why there is a pay-out to BYW Inc. of $75,000 on the HUD1 Settlement statement dated 2/15/2007.

29. Meade Ave., #31
   a. Green does not know why there is a pay out to BYW Inc of $75,000 on the HUD1 Settlement Statement dated 1/4/2007.
   b. Green did not hire BYW Construction or BYW Inc to perform any work on any of the properties that he purchased.

30. Meade Ave.,#32
   a. The residential loan application for 3532 Meade Ave., # 32, San Diego, CA signed by Green on 3/29/2007 states that the property will be an investment property. Green informed the agents that the statement is correct, because Green purchased the property as an investment to rent out.
   b. Sometime while he was going through the process of purchasing the properties, Green received a telephone call from someone at _____ office. The individual informed Green that he needed to come up with more income in order to qualify for additional property purchases. The individual asked Green if he had another company name that could be used on his loan application. Green informed the individual that he had an inactive company from years ago that was not active. Green gave the individual the company name MB&S Inc. to place on his loan application. Green actually had a company by the name

BYW-RPRTS-000078

MB&S Inc.; however it was not an active company.

c. Green cannot remember who he spoke with            company, but thinks it was an Indian female.

d. The loan application states that Green's monthly income is $23,300 per month. Green was not making that amount of money every month. As Green previously stated, he made on average $10,000 to 12,000 per month.

e. Green's net worth on the loan application of $190,000 does not appear accurate, but Green would have to check his records to make sure.

f. Green does not know why there is a pay-out to BYW Inc of $80,000 on the HUD1 Settlement Statement dated 4/5/2007.

g. Green filed for bankruptcy in February 2009. The loans for all of the properties that he purchased were discharged.

h. Green was shown a Verification of Deposit dated 12/26/2006 from Washington Mutual bank, showing a current balance of approximately $99,000. Green has never had an account balance of $99,000. Green had an account at Washington Mutual, which included a line of credit. The largest amount that Green ever had in his account would have been no more than $30,000.

i. Green planned on turning the company MB&S into a singing studio, but it never worked out. Green wanted to produce music, but the venture never "took off."

j. Green was shown a letter dated 3/23/2007 signed by John McKinney stating in part that M&M has been preparing business tax forms schedule c for Kendrick Green since tax year 2003 to the present. Green informed the agents that McKinney was Green's return preparer at one time. McKinney prepared a few tax returns for Green, but Green does not remember the exact years.

31. Meade Ave., #40

a. Green does not know why there is a pay out to BYW Inc of 77,500 on the HUD1 Settlement Statement dated 2/22/2007.

b. As stated previously, Green does not know who BYW is, and he did not hire them to perform any work on any of the properties that he purchased.

32. Meade Ave., #41

a. The residential loan application for 3532 Meade Ave., #41 San Diego, CA lists the property as secondary residence. Green informed the agents that this is not accurate because Green purchased the property as an investment, and rented out the property.

b. Green stated that all of the properties he purchased at Meade were investment properties.

c. Green informed the agents that he was not making $22,900 per month in income as stated in the loan application.

d. Green does not know why there is a pay out to BYW Inc of $77,500 on the HUD1 Settlement Statement dated 2/23/2007.

BYW-RPRTS-000079

33. After Green reviewed the loan applications and HUD1 for the above properties, the Special Agents asked Green if he ever received any cashier's checks made payable to Kendrick Green, with the remitter as BYW Construction. The Agents showed Green copies of various cashier's checks made payable to him. Green became very nervous at this point during the interview. Green informed the agents that he was not sure if he wanted to answer the question. The agents reminded Green that he is not under arrest and that he is doing the interview voluntarily and that he is free to leave and stop the interview at any time.

34. Green asked the agents if they felt he should get an attorney. The agents informed Green that they could not give him any advice regarding an attorney.

35. Green asked the agents if he did anything wrong. The agents informed Green that the loan applications that he signed and submitted for loan approval are false.

36. Green informed that agents that he would not answer the questions regarding whether or not he received cashier's checks for the purchases of the above companies, but that the interview could continue with other questions.

37. Green identified his 2006, 2007, and 2008 U.S. Individual Income tax returns. Green identified his signature and stated that these are the tax returns that he filed.

38. Green informed the agents that the Income on the above tax returns are the actual income that he was making at the time. Green stated that the income he placed on the tax returns are accurate, and the income on the loan applications submitted were not.

I prepared this memorandum on March 31, 2011, after refreshing my memory from notes made during and immediately after the interview with Kendrick Green.

Memorandum Author

Darline M Toussaint
IRS Special Agent

BYW-RPRTS-000080